# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### FILE NO. 24-cv-00948

| | | |
|---|---|---|
| MICAH CAMPBELL, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNIVERSITY OF NORTH | ) | COMPLAINT |
| CAROLINA AT GREENSBORO, | ) | |
| UNIVERSITY OF NORTH | ) | |
| CAROLINA BOARD OF | ) | |
| GOVERNORS, TINA E. VIRES, | ) | |
| in her individual capacity, | ) | |
| SUSAN WISE, in her | ) | |
| individual capacity. | ) | |
| Defendants. | ) | |

## COMPLAINT

### (Jury Trial Demanded)

NOW COMES Plaintiff, Micah Campbell, and brings this action against the University of North Carolina at Greensboro for violations of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, and the Civil Rights Act of 1964.

## PARTIES

1. Micah Campbell (hereinafter "Mr. Campbell" or "Plaintiff") is a citizen and resident of Wake County, North Carolina.

2. Defendant, the University of North Carolina at Greensboro (hereinafter "Defendant UNCG" or "UNCG") is one of the campuses or universities of the University of North Carolina System (hereinafter "UNCS") and is located in Guilford County, North Carolina.

3. Pursuant to N.C. Gen. Stat. § 116-3, The University of North Carolina is a public multicampus university established and operated by the State of North Carolina and is a body politic and corporate, capable in law to be sued in all courts, and Defendant UNCG is one of the constituent institutions of the UNCS, capable in law to be sued in all courts whatsoever, with its principal office in Guilford County, North Carolina.

4. The University of North Carolina Board of Governors (hereinafter "Defendant BOG" or "the Board") is the policy making body legally charged with the general determination, control, supervision, management, and governance of affairs of the constituent institutions, including Defendant UNCG.

5. At all times relevant to this action, Tina E. Vires was the Director of Defendant UNCG's Office of Accessibility Resources and Services ("OARS"). Upon information and belief, she still holds this position. Upon further information and belief, she is a citizen and resident of Greensboro, Guilford County, North Carolina. She is being sued in her individual capacity.

6. At all times relevant to this action, Susan Wise was the Assistant Director of OARS. Upon information and belief, she still holds this position. Upon further information and belief, she is a citizen and resident of Greensboro, Guilford County, North Carolina.

<u>JURISDICTION AND VENUE</u>

7. This action is brought for discrimination in public services pursuant to the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12131, *et. seq.* ("ADA"), Section 504 of the Rehabilitation Act, 29 U.S.C.§ 794 ("Section 504"), and Title VI of the Civil Rights Act of 1964. Consequently, this Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331.

8. Venue in the United States District Court for the Middle District of North Carolina is proper pursuant to 28 U.S.C. § 1391(b) due to the

events giving rise to this action occurring in Greensboro, Guildford County, North Carolina which is located in this Court's judicial district.

## FACTUAL ALLEGATIONS

9. Plaintiff is a person with a disability as defined by the ADA and Section 504.

10. Plaintiff was diagnosed with Post Traumatic Stress Disorder (hereinafter "PTSD") in 2019.

11. When Plaintiff has an episode related to his PTSD, the following manifestations may occur:

    a. Tension within his body;

    b. Detachment from reality, including time and space;

    c. Inability to hear communication from other people; and/or

    d. Increased irritability and/or aggression.

12. Plaintiff utilizes a service animal, a German Shephard named "Aspen". Aspen is trained to detect when Plaintiff may have an episode, and to warn the Plaintiff when an episode is soon to occur. Aspen is also trained to assist Plaintiff cope and recover from a PTSD episode as quickly and safely as possible.

13.    In the Fall of 2023, Plaintiff began attending UNCG.

14.    Plaintiff lived in on campus housing for the Fall semester of the 2023-2024 academic year.

15.    Plaintiff contacted Defendant OARS upon acceptance into UNCG concerning his disabilities and the need for Aspen on campus.

16.    Defendant UNCG approved Aspen being on campus in this capacity.

17.    On or about January 5, 2024, an employee at the Defendant UNCG's Information Desk within the Elliot University Center ("EUC") Building on campus stopped Mr. Campbell as he was trying to locate a restroom within the building.  The employee asked, "what task is your dog trained to perform?"  Mr. Campbell, stunned by the employee's ambush, was silent.  The employee accosted Mr. Campbell with questions, an unsolicited opinion about individuals with disabilities as follows:

> A lot of people pretend that they have a disability and that their dog is a service animal when the dog is not trained, and the individual does not have the need for the animal. You can understand why I stopped you? If your dog is not actually a service animal, we will have to shut all the food facilities down because of your animal. What task is your dog trained to perform?

18.    Eventually, Mr. Campbell was able to articulate his response that Aspen was a trained PTSD service dog and advised that employee that it was not appropriate for her to interact with him and Aspen in that manner; particularly because Aspen was not behaving inappropriately, and she was wearing her appropriate identifying harness at the time.

19.    That evening, Mr. Campbell called Susan Wise, who is, upon information and belief, the Assistant Director OARS concerning the interaction at the bookstore.  Ms. Wise agreed to investigate Mr. Campbell's claim.  Mr. Campbell followed up with Ms. Wise via email.

20.    On or about January 16, 2024, a UNCG employee asked Mr. Campbell why he needed Aspen. Simultaneously, a student attempted to get Aspen's attention and pet her despite garments indicating she was working and should not be petted.  These interactions triggered Mr. Campbell's PTSD, resulting in immediate emotional distress and anxiety.

21. Mr. Campbell contacted Ms. Wise again. Ms. Wise responded that Defendant UNCG would work on training school staff as well as students on service animal policies, procedures and best practices.

22. On or about January 25, 2024, while at "The Pita Pit" on campus, an unidentified University employee returning to work stopped and began talking to Aspen while Mr. Campbell was getting a drink.

23. Mr. Campbell reported this incident to Ms. Wise. He expressed concern that this was at least the third incident in the past few weeks wherein faculty, staff, and/or students questioned Mr. Campbell's need for Aspen, inquired about his disabilities, or engaged Aspen such that she would be distracted if she needed to engage in the activity she is trained to do for Mr. Campbell. Mr. Campbell requested that Ms. Wise follow up with him concerning his correspondence.

24. In each subsequent email to Ms. Wise, it was clear that Mr. Campbell was frustrated, stressed, embarrassed and otherwise experiencing emotional distress from being harassed about Aspen, and the prospect that she would not be available to attend to his medical needs if she was distracted by UNCG employee or student.

25.   Ms. Wise advised the Defendant UNCG was working on retraining the staff in the food areas, and that flyers had been posted around campus advising students about their interactions with service animals.

26.   Ms. Wise asked Mr. Campbell to speak with Aimee Trippell, who works in dining services, about his experiences. Mr. Campbell declined and explained that he would rather focus on his coursework and exams.  He proposed the alternative that Ms. Wise share his emails with whomever she deemed appropriate to ensure these matters would be addressed.   Ms. Wise agreed with this proposal.   Mr. Campbell advised that he would be happy to speak with whomever in the event the incidents continued to occur.

27.   On or about February 16, 2024, Mr. Campbell attended a baseball game with another student at the Defendant UNCG's on campus baseball field.

28.   When Mr. Campbell arrived, an unidentified African American security guard followed him throughout the facility, and eventually inquired about Aspen's status as a service animal.

29.    The guard was loud, dismissive, and aggressive.   He asked impermissible questions to Mr. Campbell including what the nature of his disability was.

30.    The security guard incorrectly concluded that Aspen was an "emotional support animal" and opined that Mr. Campbell only brought Aspen so he could "hang out with [his] little buddy."

31.    At least three white individuals with dogs were also present at the game.   None of them were subjected to treatment Mr. Campbell endured. Mr. Campbell brought this discrepancy to the guard's attention while questioning whether the guard understood that his actions toward Mr. Campbell violated federal law.  The guard insisted that his actions were consistent with Defendant UNCG's policies and became increasingly combative with Mr. Campbell.

32.    Mr. Campbell called and emailed Ms. Wise expressing his frustration at the lack of training and treatment experienced at the baseball game held on-campus. Ms. Wise told Mr. Campbell that he could reach out to the security guards' employer to express additional concerns while implying the security guard was not an employee of the school "directly".

33.  On or about March 27, 2024, while in the EUC ordering lunch, an employee asked Mr. Campbell if Aspen was a seeing eye dog. Mr. Campbell responded that Aspen is not a seeing eye dog and advised that she is a service animal. It is important to note that Aspen was, as always, wearing garments identifying her as a service animal. The employee stated, "I know there are different types of dogs, which type is she?" Mr. Campbell indicated that Aspen was a service animal that assisted with PTSD. The employee then stated to the employees beside him at the "Sandwich Counter" that he hated dogs and did not understand why they were allowed to come into the building. His co-worker, seemingly embarrassed, immediately corrected his behavior.

34.  Mr. Campbell contacted Justin Meadows concerning this incident. Mr. Meadows interrupted Mr. Campbell during breakfast to provide his contact information, and assured Mr. Campbell that he would be treated lawfully moving forward. Mr. Meadows also insisted that Mr. Campbell immediately contact him if another incident were to occur. However, Mr. Meadows did not follow up with Plaintiff.

35.  Thereafter, Mr. Campbell emailed Ms. Wise and Tina Vires, who is, upon information and belief, the Director of the OARS. Mr. Campbell

expressed his belief that the processes Defendant UNCG was purportedly utilizing to remedy the unlawful discrimination Mr. Campbell continuously experienced, were insufficient. He also expressed his frustration with the conflicting information he was receiving from employees and supervisors at the Dining Facility who informed Mr. Campbell that "there were no discussions or trainings being conducted" in regard to his complaints. These representations were contrary to the information being provided by OARS and Mr. Meadows.

36.    Mr. Campbell informed Ms. Wise and Ms. Vires that other UNCG employees notified him that instead of Defendant taking his complaint seriously, they would first check the security cameras to ensure that he was not, "fabricating another incident".

37.    Ms. Vires responded and advised that OARS was working to train University employees about the two questions they were permitted to ask, and to dispel the preconceived notion that a canine service animal is always a "seeing eye dog."

38.    Ms. Vires advised that while she understood that Aspen wore a service animal vest to minimize confrontation, "it was not obvious that

she is trained to perform a disability task." Ms. Vires advised that neither the Department of Justice nor the ADA recognized a service animal vest, or a certificate as evidence of a disability but she was working towards having flyers placed at places throughout UNCG to increase awareness.

39. Mr. Campbell thanked Ms. Vires for her response.

40. Upon information and belief, Defendant UNCG took no further action regarding the discrimination Mr. Campbell experienced.

41. As a result of the discrimination Mr. Campbell experienced on the campus of UNCG, he reduced or eliminated his use of the privileges and benefits of the University. By way of example, Mr. Campbell would attend class and return to his room. He stopped dining at on-campus dining and took affirmative action to minimize his visibility and potential exposure to further discrimination on campus.

## FIRST CLAIM FOR RELIEF:
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
(Defendants UNCG and UNC Board of Governors)

42. The foregoing paragraphs of the complaint are restated and incorporated herein by reference.

43.    Title II of the ADA forbids public entities, including local educational agencies, to exclude or deny people with disabilities the benefits of its services, programs, or activities, or to discriminate based on disability.  42 U.S.C. § 12132; 28 C.F.R. §§ 35.104 & .130(a).

44.    Prohibited disability-based discrimination by public entities includes the failure to provide qualified individuals with disabilities an equal opportunity to participate in or benefit from aids, benefits or services or "otherwise limit" a qualified individual with a disability in the enjoyment of any right, privilege, aid, benefit, or service.  28 C.F.R. § 35.130(b)(1)(ii) & (vii).

45.    Prohibited discrimination additionally includes the failure to make reasonable modifications as necessary to avoid discrimination against an individual based on their disability. 28 C.F.R. § 35.130(b)(7)

46.    An "individual with a disability" is one who has a physical or mental impairment that substantially limits on or more of their major life activities.  42 U.S.C. § 12102(1).

47.    Major life activities include but are not limited to speaking, breathing, learning, reading, concentrating, thinking, and communicating. 42 U.S.C. § 12102(2)(A)

48. Major life activities also include the operations of a major bodily function, including neurological and brain functions. 42 U.S.C. § 12102(2)(B)

49. A "qualified individual with a disability" is one who, with or without reasonable accommodations for their disability, meets essential eligibility requirements to receive services from or participate in the programs or activities of the public entity. 42 U.S.C. § 12131(2)

50. Mr. Campbell is an individual with disabilities as defined by Title II of the ADA. See 42 U.S.C. 12102.

51. Mr. Campbell is an otherwise qualified individual with disabilities that meets essential eligibility requirements to receive services from or participate in the programs or activities of Defendant UNCG. *See* 42 U.S.C. § 12131(2).

52. Mr. Campbell has always been and continues to remain eligible to attend UNCG as he is scoring excellent grades, has had no academic or disciplinary infractions, and otherwise is a great student.

53. Plaintiff's diagnosis of Post-Traumatic Stress Disorder constitutes a disability, as it is defined by the ADA.

54.    Plaintiff was otherwise qualified to attend the University, and at all times relevant to this action, he remained qualified he remained qualified to receive the services and/or participate in the programs or activities provided by the University.

55.    As articulated herein, Plaintiff requested an accommodation, specifically, to have Aspen, his service dog, live with him on campus, and accompany him throughout the University setting including, *inter alia*, classes, dining areas, and other campus buildings.

56.    Plaintiff's accommodation request was not unreasonable and did not create an undue burden for the University.

57.    The University granted Plaintiff's accommodation request.

58.    Nonetheless, University employees and agents did not permit Aspen to accompany Plaintiff in are of the University where other students and/or the are allowed to go without forced negative interactions.

59.    At all times relevant to this action, Aspen was under Plaintiff's control, appropriately harnessed, and identified as a service animal.

60.    While University staff and agents were permitted to ask, and did, in fact, ask Plaintiff whether Aspen was required for a disability and

what tasks she had been trained to perform, they went above and beyond these parameters when they asked about the nature of Plaintiff's disability, and/or when they asked or implied that Aspen needed to be removed from the facilities.

61. Establishments that sell or prepare food must generally allow service animals in public areas even if state or local health codes prohibit animals on the premises.

62. Plaintiff contacted the appropriate University officials about the multitude of experiences wherein staff or agents of the University violated federal law.

63. Plaintiff asked for assistance with enforcement of the ADA and education for staff.

64. The discriminatory actions became so prevalent that Plaintiff was no longer receiving the full benefit of being enrolled at the University, living on campus, and having a meal plan.

65. As a result of the disability-based discrimination Mr. Campbell experienced, he is entitled to actual, consequential and compensatory damages in an amount to be proven at trial.

<u>SECOND CLAIM FOR RELIEF:</u>

<u>VIOLATION OF SECTION 504 OF THE REHABILITATION ACT</u>
<u>("THE REHABILITATION ACT")</u>
(Defendants UNCG and UNC Board of Governors)

66. The foregoing paragraphs of the complaint are restated and incorporated herein by reference.

67. Section 504 provides, "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a); see also 34 C.F.R. § 104.4(a).

68. Among other requirements, entities subject to Section 504 must ensure that they are providing equal opportunity to qualified persons with disabilities to participate or benefit from any aid, benefit, or service they make available. 34 C.F.R. § 104.4(b)(1)(ii) (2010). Additionally, these entities must avoid otherwise limiting a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service. 34 C.F.R. § 104.4(b)(1)(vii).

69. An "individual with a disability" is defined by reference to the ADA. 29 U.S.C. § 705(20)(B); referencing 42 U.S.C. §12102(1). A person has a disability under Section 504 if they have a physical or mental impairment that substantially limits on or more of their major life activities. 42 U.S.C. § 12102(1).

70. Major life activities include but are not limited to caring for oneself, performing manual tasks, sleeping, learning, concentrating, thinking, and working.  42 U.S.C. § 12102(2)(A) (2006). Major life activities also include the operations of a major bodily function, including neurological and brain functions.  42 U.S.C. § 12102(2)(B) (2006)

71. A "qualified individual with a disability" is one who, with or without reasonable accommodations for their disability, meets essential eligibility requirements to receive services from or participate in the programs or activities of a recipient of Federal financial assistance. See 29 U.S.C. § 794(a)

72. A "recipient of federal financial assistance" is a public or private agency or other entity to which Federal financial assistances is extended directly or through another recipient.  34 C.F.R. § 104.3(f).

73.   Plaintiff's diagnosis of Post-Traumatic Stress Disorder constitutes a disability, as it is defined by Section 504, referencing the ADA.

74.   Plaintiff is a person with a disability as defined by Section 504, referencing the ADA.

75.   Plaintiff's impairments affect his major life activities including, *inter alia*, sleeping, walking, standing, learning, reading, concentrating, thinking and communicating. *See* 42 U.S.C. § 12102(2)(A).

76.   Plaintiff is an otherwise qualified individual with disabilities that meets essential eligibility requirements receive services from or participate in the programs or activities of Defendant UNCG. See 42 U.S.C. § 12131(2); 29 U.S.C. § 794(a).

77.   Defendant UNCG is the recipient of federal financial assistance as it receives federal funds through the United States Department of Education.

78.   Defendant is subject to the nondiscrimination requirement of Section 504 See 29 U.S.C. § 794(a); see also 34 C.F.R. § 104.4.

79.   Defendant UNCG's staff and agents questioning of Plaintiff's disabilities, what Aspen does for him, assertions that Plaintiff simply

wants to hang out with his little friend, and disturbance of Aspen while she is performing essential job functions discriminates against Mr. Campbell as a person with disabilities who uses a service animal by denying him equal access and otherwise limiting his access to Defendant UNCG's facilities, programs, and services as compared to his non-disabled, non-service animal user peers.

80. Defendant UNCG refusal to intervene when its employees and agents refused, questioned, or otherwise acted unlawfully regarding Mr. Campbell's need for and use of Aspen throughout his academic day harms him and is illegal disability-based discrimination that violates Section 504 of the Rehabilitation Act of 1973.

81. Defendant UNCG's actions has interfered with Mr. Campbell's use of student facilities (e.g. the student bookstore), student union, on-campus dining, and common areas.

82. As a result of Defendant UNCG's disability-based discrimination against Mr. Campbell, and Defendant UNCS' failure to properly train, supervise and provide oversight to Defendant UNCG, Campbell experienced, he is entitled to actual, consequential and compensatory damages in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF:
## VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964
### (Defendants UNCG, UNC Board of Governors)

83.   The foregoing paragraphs of the complaint are restated and incorporated herein by reference.

84.   Mr. Campbell is an African American male and a person with a disability.

85.   Defendant UNCG's staff and agents unlawfully questioned Plaintiff about his disabilities, what Aspen does for him, made assertions that he just wanted to "hand out with [his] little friend, and otherwise interfering with Aspen while she is performing essential job functions.

86.   Defendant UNCG discriminated against Mr. Campbell due to his need for Aspen by denying him equal access and otherwise limiting his access to Defendant UNCG's facilities, programs, and services as compared to his White, disabled peers with service animals who are not questioned about their conditions, what their animal does, subject to interference with their service animal while they are performing essential job functions or otherwise.

87.   Defendant BOG is charged with the supervision of all member universities, including Defendant UNCG.

88.    Defendant BOG's lack of oversight, training, and administrative control over Defendant UNCG was a proximate cause of the race-based discrimination Defendant UNCG committed against Mr. Campbell.

89.    As a result of Defendant UNCG's race based discrimination against Mr. Campbell, and Defendant UNCS' failure to properly train, supervise and provide oversight to Defendant UNCG, Campbell experienced, he is entitled to actual, consequential and compensatory damages in an amount to be proven at trial.

<u>FOURTH CLAIM FOR RELIEF:</u>
<u>VIOLATION OF 42 U.S.C. § 1983 (SUPERVISOR LIABILITY)</u>
(Defendants Vires and Wise)

90.    The foregoing paragraphs of the complaint are restated and incorporated herein by reference.

91.    As the senior officials within OARS, Defendants Wise and Vires are charged with ensuring the campus is accessible for students with disabilities.

92.    Defendants Wise and Vires had actual knowledge that UNCG employees and students were engaged in unlawful, discriminatory behavior towards Mr. Campbell due to his need for Aspen.

93. Defendants Wise and Vires failed to act to correct, remedy, or otherwise stop the unlawful disability discrimination from happening.

94. In fact, the Defendants opined to at least one employee their belief that Plaintiff fabricated the incidents that he complained of.

95. As a result of Defendants failure to properly train their staff, follow up on student inquiries, and take appropriate action regarding Mr. Campbell's complaint, Mr. Campbell suffered damages in an amount to be proven at trial.

<u>FIFTH CLAIM FOR RELIEF:</u>
<u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>
(Defendant Vires and Wise)

96. The foregoing paragraphs of the complaint are restated and incorporated herein by reference.

97. Defendants Wise and Vires' failure to take affirmative action in response to Plaintiff's numerous complaints about the disability and racial discrimination he experienced on campus was extreme and outrageous.

98. Both Defendants were aware of Plaintiff's diagnosis.

99. Both defendants received increasingly anxious written communication from Plaintiff asking for help.

100. Defendant intended to cause Plaintiff emotional distress and/or acted with reckless disregard when dismissed Plaintiff's concerns and inferred that employees and/or staff ignoring Aspen's vest, and its instructions not to engage or touch her, were not in violation of the law or UNCG policies.

101. Defendant Vires response to Plaintiff did, in fact, cause him to suffer severe emotional distress.

102. Plaintiff was no longer comfortable availing himself of the services and amenities on campus, and thus, was constructively denied access to the same, by virtue of both Defendants apathy.

103. Both Defendants' conduct, as explained herein, was the proximate cause of Plaintiff's emotional distress.

104. Plaintiff experienced more frequent PTSD symptoms and required continued mental health services to address the emotional distress he experienced on campus.

105. Defendants Wise and Vires conduct, as outlined above, was extreme and outrageous, going beyond all bounds of decency.

106. Defendants Wise and Vires intended to cause Plaintiff emotional distress or acted with reckless disregard for the likelihood of causing such distress.

107. Plaintiff suffered severe emotional distress, demonstrated by him refusing to leave his room, except to attend class, and no longer availing himself of the services and amenities on campus, including his meal plan, due to fear of interrogation, discrimination, and/or Aspen being too distracted to respond to a PTSD episode due to staff and/or student behavior.

108. Defendants Wise and Vires actions were the direct and proximate cause of Plaintiff's emotional distress.

109. As such, Defendant Wise and Vires are liable to Plaintiff for actual, compensatory and consequential damages.


## SIXTH CLAIM FOR RELIEF (IN THE ALTERNATIVE TO THE FIFTH CLAIM FOR RELIEF): NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Defendants Wise and Vires)

110. The foregoing paragraphs of the complaint are restated and incorporated herein by reference.

111. Defendants Wise and Vires owed Plaintiff a duty of care. Specifically, University employees, particularly those dealing with sensitive populations, such as disabled individuals, are expected to act reasonably to protect the health, safety and welfare of their students.

112. Defendants Wise and Vires breached a duty of care owed to Plaintiff by failing to act and/or failing to act appropriately to Mr. Campbell's disability discrimination complaints. Furthermore, they breached their duty of care when they were dismissive of Mr. Campbell's reports and when they insisted that he was fabricating his experiences.

113. As a direct result of Defendant Wise and Defendant Vires negligence, Plaintiff's PTSD was exacerbated, and he experienced increasingly severe emotional distress which resulted in him no longer availing himself of the programs and benefits offered by Defendant UNCG.

114. Defendant Wise and Defendant Vires' conduct was the proximate cause of Plaintiff's emotional distress.

115. As such, Defendant Wise and Vires are liable to Plaintiff for actual, compensatory and consequential damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays to this Court for relief as follows:

1. Award compensatory damages in excess of $100,000.00 in an amount to be proven at trial;

2. Award consequential damages in excess of $100,000.00 in an amount to be proven at trial;

3. Award punitive damages in excess of $100,000.00 in an amount to be proven at trial;

4. That any damages awarded be taxed jointly and severally to the Defendants;

5. Order Defendants UNCG and UNCS to review their policies and procedures to ensure compliance with federal and state disability laws;

6. Order Defendants UNCG and UNCS to review their policies and procedures to ensure compliance with federal race-based discrimination laws;

7. Order that Defendant UNCG train all faculty and staff on the federal laws and regulations related to service animals;

8. Order the Defendant UNCG conduct an information session for students each semester through the Summer of 2026 wherein it informs students of what is, and is not, permissible with regards to service animals on campus;

9. A jury trial on all appropriate issues;

10. Award Plaintiff reasonable attorney's fees and costs;

11. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted, this the 14th day of November, 2024.

/s/ Neubia L. Harris
Neubia L. Harris
N.C. Bar No.: 42069
The Law Office of Neubia L. Harris, PLLC
312 W. Millbrook Road, Ste. 141
Raleigh, NC 27609
(919) 526-0500 (telephone)
(919) 589-3935 (facsimile)
neubia@neubiaharrislaw.com
*Attorneys for Plaintiff*