IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| MICAH CAMPBELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNIVERSITY OF NORTH | ) | |
| CAROLINA AT GREENSBORO, | ) | 1:24CV948 |
| UNIVERSITY OF NORTH | ) | |
| CAROLINA BOARD OF | ) | |
| GOVERNORS, TINE E. VIRES, | ) | |
| in her individual capacity, SUSAN | ) | |
| WISE, in her individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

The plaintiff, Micah Campbell, is a Black man who attended the University of North Carolina at Greensboro in 2024. Campbell, who suffers from Post-Traumatic Stress Disorder, had a service dog named Aspen who accompanied him everywhere on campus. At various times, university employees and students made comments to Campbell questioning his need for Aspen, or interacted directly with Aspen, both of which caused Campbell emotional distress. Campbell advised University personnel about these incidents, and they did not take the corrective action he requested. Based on this, Campbell alleges that the defendants variously violated federal and state law during his time on campus.

The defendants have moved to dismiss the Second Amended Complaint. Because the facts as pled, taken in the light most favorable to Campbell, do not support relief, the Court should grant the defendants' motion and dismiss this matter with prejudice, as set forth below.

### I. FACTS

Because all well-pled facts are accepted as true and considered in the light most favorable to the plaintiff, what follows are the facts as Campbell has alleged in the Second Amended

Complaint, Docket Entry 14. *See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 255 (4th Cir. 2009).

In 2019, Campbell was diagnosed with post-traumatic stress disorder ("PTSD"). Second Am. Compl. ¶ 9. When he experiences an episode related to his PTSD, he may experience tension in his body, detachment from reality (including time and space), inability to hear other people, and increased irritability or aggression. *Id.* ¶ 10. Campbell's PSTD affects his ability to learn, read, concentrate, think, and communicate. *Id.* ¶ 11. Aspen is Campbell's service dog who is trained to detect a PTSD episode, warn Campbell, help him cope, and assist him in a quick and safe recovery. *Id.* ¶ 12.

Campbell was accepted to the University of North Carolina at Greensboro ("UNCG" or "University") and began taking classes in the Spring of 2024. *Id.* ¶¶ 13, 15. After his acceptance, he contacted UNCG's Office of Accessibility Resources and Services ("OARS") about his diagnosis and his need for Aspen to be on campus with him. *Id.* ¶¶ 5, 14, 15. UNCG approved Campbell's request and allowed Aspen to live in student housing and accompany Campbell in and around campus. *Id.* ¶ 16.

A.  January 5, 2024 incident

Shortly after Campbell began attending UNCG, though, employees and students asked him questions about Aspen. On January 5, 2024, he was trying to find a bathroom in the Elliot University Center Building on campus. *Id.* ¶ 17. Aspen was with Campbell and wearing a "clearly visible harness identifying her as a service animal." *Id.* An employee stationed at the Information Desk "accosted" Campbell "and demanded to know what specific tasks Aspen, [Campbell's] service dog, was trained to perform." *Id.* Campbell experienced "immediate and severe anxiety, rendering him temporarily unable to respond." *Id.* ¶ 18.

The employee continued, "'A lot of people pretend that they have a disability and that their dog is a service animal when the dog is not trained, and the individual does not have the need for the animal.'" *Id.* "'If your dog is not actually a service animal, we will have to shut all the food facilities down because of your animal.'" *Id.* She asked, "'You can understand why I stopped you?'" *Id.* Once Campbell overcame his anxiety, he responded and explained that Aspen was a service dog trained to assist him with PTSD. *Id.* ¶ 19.

The University's Animals on Campus Policy directed students to report a concern about disability discrimination or harassment. *Id.* ¶ 22 n.2. Having experienced "significant emotional distress" from the interaction with the employee at the Information Desk, Campbell reported the incident that evening to Susan Wise, the Assistant Director of

OARS. *Id*. ¶¶ 21, 22. Wise "acknowledged the seriousness of Mr. Campbell's concerns and agreed to investigate the matter." *Id*. ¶ 22. Campbell emailed Wise additional details and requested a formal response from the University about the employee's conduct.[1] *Id*. The University took no immediate remedial action. *Id*.

### B. January 16, 2024 incident

On January 16, 2024, while Campbell was on campus with Aspen, a University employee approached and questioned him about the necessity of Aspen. *Id*. ¶ 23. Simultaneously, a student attempted to distract Aspen by calling out to her and trying to pet her. *Id*. ¶ 24. At the time, Aspen was wearing her "garments" identifying her as a working service animal who should not be disturbed. *Id*. These interactions triggered Campbell's PTSD, and he immediately experienced "heightened anxiety, difficulty concentrating, and physical manifestations of stress." *Id*. ¶ 25.

Campbell reported to Wise "the ongoing issues he was experiencing." *Id*. ¶ 28. She told him that "UNCG would work on training school staff and students on service animal policies, procedures, and best practices." *Id*. But Wise did not give

Campbell a specific timeline or any further details. *Id*.

### C. January 25, 2024 incident

On January 25, 2024, while Campbell and Aspen were at the "Pita Pit" on campus, a University employee who was returning to work stopped and began talking to Aspen while Campbell was getting a drink. *Id*. ¶ 29. This interaction distracted Aspen from her duties and created a potential risk to Campbell's health and safety. *Id*.

As he had done before, Campbell reported this incident to Wise and expressed concern that it was at least the third incident in the past few weeks. *Id*. ¶ 30. He "explicitly requested" that Wise follow up with him, "but no meaningful resolution was provided." *Id*. Campbell continued to email Wise, telling her that "the repeated harassment about Aspen" was causing him "frustration, stress, embarrassment, and emotional distress" and that he was concerned that Aspen's ability to attend to his medical needs could be compromised. *Id*. ¶ 31.

In response, Wise told Campbell that the University "was working on retraining staff in the food areas and that flyers had been posted around campus to educate students about appropriate interactions with service animals." *Id*. ¶ 32. But Campbell saw

---

[1] Campbell first refers to this employee as stationed at the Information Desk of the Elliot University Center Building, Second

Am. Compl. ¶ 17, but later refers to her as a bookstore employee, *id*. ¶ 22.

"no noticeable improvement." *Id.* Wise also asked Campbell to speak with the manager of dining services about his experiences, but Campbell declined due to his coursework and exams. *Id.* ¶ 33. Instead, he asked Wise to share his emails with the appropriate people, and she agreed to do so. *Id.* Campbell told her that he would be willing to talk with individuals if the incidents continued. *Id.*

## D. February 16, 2024 incident

Several weeks later, on February 16, 2024, Campbell, a friend, and Aspen attended a baseball game on campus. *Id.* ¶ 34. Upon their arrival, a security guard followed them and, in a "loud, dismissive, and aggressive tone," asked about Aspen's status as a service animal. *Id.* ¶¶ 34, 35, 39. He erroneously concluded that Aspen was an "'emotional support animal'" and claimed Campbell brought Aspen so he could "'hang out with [his] little buddy.'" *Id.* ¶ 36 (alteration in original). Meanwhile, at least three white individuals with dogs were also at the game but no one subjected them to the same treatment as Campbell. *Id.* ¶ 37.

As the University's Events Accessibility Policy instructed, Campbell emailed Wise about "his inability to access the baseball game free from discrimination and harassment." *Id.* ¶¶ 38 n.3, 39. Instead of following University policy

and investigating the complaint, Wise suggested that Campbell contact the security guard's employer. *Id.* ¶ 39.

## E. March 27, 2024 incident

On March 27, 2024, Campbell was ordering lunch in the Elliot University Center when an employee asked if Aspen was a seeing eye dog. *Id.* ¶ 40. Aspen was "wearing garments identifying her as a service animal." *Id.* Campbell told the employee that Aspen was his service dog. *Id.* The employee continued, "'Which type is she?'" *Id.* Campbell told the employee that Aspen assisted with his PTSD. *Id.* Then the employee announced to his coworkers and Campbell that he hated dogs and did not understand why they were allowed in the building. *Id.* One of those coworkers who appeared embarrassed "immediately corrected his behavior." *Id.*

Campbell contacted Justin Meadows[2] about the incident. *Id.* ¶ 41. Interrupting Campbell's breakfast to provide his business card and contact information, Meadows assured Campbell he would be treated lawfully going forward and "insisted that Mr. Campbell immediately contact him if another incident occurred." *Id.* ¶¶ 41, 44. Meadows also suggested Campbell speak with the dining services management. *Id.* ¶ 41.

Campbell called Meadows, but he never answered the calls or responded to the voicemails. *Id.* ¶ 42. "As a

---

[2] Campbell does not provide any information about Meadows – for whom

he worked, his role, or why Campbell contacted him.

result, Mr. Campbell notified Mr. Meadows that he did not want to speak to the management team." *Id.* ¶ 43. Having to reiterate his complaints despite following University policy "further exacerbated his PTSD symptoms, anxiety, and inability to access . . . UNCG's programs and services free from discrimination." *Id.*

Campbell emailed Wise and Tina Vires, the Director of OARS, and expressed his belief that UNCG's efforts to address the discrimination were insufficient. *Id.* ¶ 45. He shared his frustration that the information Wise and Meadows gave him conflicted with the information dining services employees and supervisors were giving him. *Id.* The employees and supervisors were telling him that "'there were no discussions or training being conducted'" associated with his complaints. *Id.*

These were not the only employees talking with Campbell. *See id.* ¶ 46. Campbell also told Wise and Vires that other employees told him the University was not taking his complaints seriously and was, instead, checking security camera footage first to see if Campbell was "'fabricating another incident.'" *Id.* This information "further exacerbated Mr. Campbell's emotional distress." *Id.*

Vires responded and said that "OARS was working to train university employees on the two questions they were permitted to ask under the ADA and to dispel the misconception that all service animals are 'seeing eye dogs.'" *Id.* ¶ 47. She told Campbell "she was working to have flyers placed around campus to increase awareness," but she took no concrete actions "to address the systemic issues." *Id.* ¶ 48. Upon Campbell's information and belief, "UNCG took no further action to address" the reported incidents. *Id.* ¶ 50.

As a result of all of these incidents, Campbell "significantly reduced or eliminated his use of the privileges and benefits of the university." *Id.* ¶ 51.[3] On campus, he only went to class and to his room. *Id.* He stopped dining on campus. *Id.* He only attended sporting events if his father or girlfriend went with him. *Id.* He "benched himself" from participating in UNCG's Esports CS2 team. *Id.* ¶ 52. He "took deliberate steps to minimize his visibility and potential exposure" to additional incidents. *Id.* Ultimately, he moved off campus. *Id.* ¶ 54. He was then ineligible for student health insurance and could not access his mental health provider. *Id.*; *see also id.* ¶ 53.

## II.  PROCEDURAL POSTURE

On November 14, 2024, Campbell filed suit in this District against the defendants. Compl., Docket Entry 1. He amended the Complaint twice, *see* First Amended Complaint, Docket

---

[3] Campbell does not allege when he took any of these actions.

Entry 8, and filed the operative Second Amended Complaint on March 28, 2025.

He alleges that UNCG and the University of North Carolina Board of Governors ("Board of Governors") violated the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504"). Second Am. Compl. ¶¶ 55-83 (ADA claim against UNCG), ¶¶ 84-99 (ADA claim against the Board of Governors); ¶¶ 100-26 (Section 504 claim against UNCG and the Board of Governors).

He also alleges that UNCG and the Board of Governors violated Title VI of the Civil Rights Act by discriminating against him on the basis his race. *Id*. ¶¶ 127-37.

Campbell brings a claim of supervisor liability under 42 U.S.C. § 1983 against Wise and Vires. *Id*. ¶¶ 90-100.[4]

He also alleges Wise and Vires intentionally, or in the alternative negligently, inflicted emotional distress in violation of North Carolina common law. *Id*. ¶¶ 138-62.[5]

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the

defendants collectively moved to dismiss the Second Amended Complaint in its entirety for failure to state a claim. *See* Mot. to Dismiss, Docket Entry 16.

### III.    DISCUSSION

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Legal conclusions "must be supported by factual allegations" that amount to more than "unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *Id*. (citing *Twombly*, 550 U.S. at 555).  In other words, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555-56.

Courts have long recognized that a plaintiff does not need to plead a prima facie case of discrimination at the motion to dismiss stage. *See, e.g.*, *Finn v. Humane Soc. of the U.S.*, 160 F.4th 92, 97 (4th Cir. 2025) (citing

---

[4] The paragraph numbering in the Second Amended Complaint is not always sequential.  The Title VI claim ends with paragraph 137.  But the numbering of the paragraphs reverts to paragraph 90 at the start of the § 1983 supervisor liability claim.

[5] Although the supervisor liability claim ends with paragraph 100, the intentional infliction of emotional distress claim begins at paragraph 138.

Case 1:24-cv-00948-DAB-JGM    Document 24    Filed 05/22/26    Page 6 of 31

*Swierkiewicz v. Sorema*, 534 U.S. 506, 510 (2002)). "That is because the *McDonnell Douglas*[6] framework's prima facie case 'is an evidentiary standard, not a pleading standard.'" *Barbour v. Garland*, 105 F.4th 579, 590 (4th Cir. 2024) (quoting *Swierkiewicz*, 534 U.S. at 510). "[A] plaintiff is nonetheless 'required to allege facts to satisfy the elements of a cause of action created by [the relevant] statute' in compliance with *Iqbal*.'" *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017) (quoting *McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 585 (4th Cir. 2015)).

In other words, a plaintiff is not required to prove his case in the complaint, *see, e.g.*, *Robertson v. Sea Pines Real Est. Cos.*, 679 F.3d 278, 291 (4th Cir. 2012); *Scott v. City of Durham*, No. 1:20-CV-558, 2021 WL 3856168, at *2 (M.D.N.C. August 27, 2021), but the complaint's allegations should "allow 'the court to draw a reasonable inference that the defendant is liable for the misconduct alleged,'" *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678).

On a motion to dismiss, courts view the allegations in the complaint as true, drawing all inferences in the plaintiff's favor. *See Twombly*, 550 at 555–56 (2007); *Langford v. Joyner*, 62 F.4th 122, 124 (4th Cir. 2023). But courts are not required to "accept as true 'legal conclusions drawn from the facts' or any other 'unwarranted inferences, unreasonable conclusions, or arguments.'" *Just Puppies, Inc. v. Brown*, 123 F.4th 652, 660 (4th Cir. 2024) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)).

A. The ADA and Section 504 claims fail as a matter of law.

Campbell alleges that UNCG and the Board of Governors violated the ADA and Section 504. *See* Second Am. Compl. Counts I and II. He claims that, despite his reports to "the appropriate University officials on multiple occasions," "University employees and agents repeatedly failed to permit Aspen to accompany [him] in areas of the University where other students were allowed to go without interference or forced negative interactions" and "University staff and agents" asked "intrusive" questions about his disability and implied that Aspen should be removed from the facilities. *Id*. ¶¶ 71, 73; *see also id*. ¶¶ 120-23.

He focuses on the "[r]epeated questions by University employees about the necessity of Aspen as a service animal," "comments made by University staff, including accusations that [he] was fabricating his need for a service animal," "[f]ailure to prevent students and staff from distracting Aspen," and "[f]ailure to adequately train

---

[6] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

7

University employees and students" on these issues. *Id.* ¶ 77. As a result of these "[p]ervasive" "discriminatory actions," Campbell "was no longer able to receive the full benefits of being enrolled at the University, living on campus, and having a meal plan." *Id.* ¶ 76.

"To the extent possible, [courts] construe the ADA and Rehabilitation Act to impose similar requirements." *Halpern v. Wake Forest Univ. Health Sci.*, 669 F.3d 454, 461 (4th Cir. 2012). Title II of the ADA directs that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. *Compare id. with* 29 U.S.C. § 794(a) (providing similar protection under Section 504 of the Rehabilitation Act). A "public entity" includes "any department, agency, . . . or other instrumentality of a State." 42 U.S.C. § 12131(1)(B). And a "program of activity," referred to in Section 504, "means all of the operations of . . . a college, university, or other postsecondary institution, or a public system of higher education." 29 U.S.C. § 794(b)(2)(A).

Although "[t]he ADA and Rehabilitation Act generally are construed to impose the same requirements due to the similarity of the language of the two acts," a violation of the ADA requires that an individual's disability be "a

motivating factor" in the adverse action; whereas, Section 504 requires that the disability be the sole reason for the adverse action. *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468-70 (4th Cir. 1999).

"In general, a plaintiff seeking recovery for violation of either statute must allege that (1) [he] has a disability, (2) [he] is otherwise qualified to receive the benefits of a public service, program, or activity, and (3) [he] was excluded from participation or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of [his] disability." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005) (citing *Baird*, 192 F.3d at 467-70 and *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264-65 & n.9 (4th Cir. 1995)). *See also Halpern*, 669 F.3d at 461-62.

The University and the Board of Governors argue that Campbell fails to allege facts that support the third prong: that is, exclusion from participation or denial of benefits of any program or service. Mem. in Supp. of Mot. to Dismiss at 7, Docket Entry 17 ("Mem. in Supp."). They further argue that he, by his own "affirmative action," excluded himself from campus activities.

Campbell correctly argues that the law prohibits more than outright exclusion from public programs. Mem. of Law in Opp'n to Defs.' Mot. to Dismiss Pl.'s Second Am. Compl. at

5, Docket Entry 19 ("Mem. in Opp'n").[7] The law also requires meaningful access to those programs. *Id.* (citing *Alexander v. Choate*, 469 U.S. 287, 301 (1985)). Indeed, "Congress has told us that disability 'discrimination' includes not just 'outright intentional exclusion' but also lesser injustices like 'failure to make modifications to existing facilities and practices' and 'relegation to lesser services, programs, activities, benefits, jobs, or other opportunities.'" *Koon v. North Carolina*, 50 F.4th 398, 405 (4th Cir. 2022) (quoting 42 U.S.C. § 12101(a)(5)).

Thus, "we ask whether a disabled [person] was denied 'meaningful access' to the benefit." *Id.* at 406 (quoting *Alexander*, 469 U.S. at 301 and noting that *Alexander* discusses "nearly identical language in § 504 of the Rehabilitation Act"). "[T]o assure meaningful access, reasonable accommodations in the . . . program or benefit may have to be made." *Alexander*, 469 U.S. at 301. An accommodation that "is so inadequate that it deters the plaintiff from attempting to access the services otherwise available to him" is "not [a] plainly reasonable" accommodation. *Wright v. N.Y. State Dep't of Corrs.*, 831 F.3d 64, 73 (2d Cir. 2016), *cited in Koon*, 50 F.4th at 406.

Meaningful access does not require perfect access, but it must be effective

access. *Id.* at 72 (quoting *Dean v. Univ. at Buffalo Sch. Of Med. & Biomedical Scis.*, 804 F.3d 178, 189 (2d Cir. 2015)), *cited in Koon*, 50 F.4th at 406; *see also Gustafson v. Bi-State Dev. Agency*, 29 F.4th 406, 412 (8th Cir. 2022) ("Under the meaningful access standard, services 'are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons, but must afford handicapped persons equal opportunity to . . . gain the same benefit.'") (quoting *Alexander*, 469 U.S. at 305).

As is relevant here, the law generally requires a public entity to allow an individual with a disability to use a service animal, even if that requires modification of policies, practices, or procedures. *See* 28 C.F.R. § 35.136(a). And the service animal must be able to accompany the individual with a disability "in all areas of a public entity's facilities where members of the public, participants in services, programs, or activities, or invitees . . . are allowed to go." 28 C.F.R. § 35.136(g). While a public entity's staff are not permitted to ask all manner of questions about the service animal, they are permitted to ask two questions to determine if the animal is, indeed, a service animal: (1) is the animal required because of a disability and (2) what work or task is

---

[7] Campbell also correctly notes that he does not have to plead discriminatory animus. Mem. in Opp'n at 7 (citing *Smith*

*v. N.C. Dep't of Safety*, No. 1:18CV914, 2019 WL 3798457, at *3 (M.D.N.C. Aug. 12, 2019)).

the animal trained to perform. 28 C.F.R. § 35-136(f).

The University and the Board of Governors contend that Campbell has not sufficiently alleged discrimination on the basis of his disability. Mem. in Supp. at 7-9 (addressing allegations of mere "discomfort, frustration, [and] disappointment"[8] and failure to allege he was treated differently than similarly situated individuals because of his disability).

Campbell concedes he has not sufficiently alleged a Section 504 claim or disparate treatment based on his disability. *See* Mem. in Opp'n at 4-5 (discussing the ADA's requirement that disability be only a motivating factor in discrimination), 5 (stating that the law also prohibits "discrimination through denial of reasonable modifications or creation of a hostile environment"). Instead, he maintains that he has plausibly alleged a hostile environment where the University was deliberately indifferent, resulting in constructive discharge from the use and benefits of the University's services, programs, and activities. *Id.* at 6-7 (citing *Rohan v. Networks Presentations LLC*, 375 F.3d 266 (4th Cir. 2004)

(acknowledging a hostile environment theory under the ADA)).

Indeed, the University and the Board of Governors contend that, at best, Campbell's allegations are "analogous to a constructive discharge claim." Mem. in Supp. at 8 (citing *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019) (providing the elements of a constructive discharge claim in the employment context). Even so, they argue, he has not plausibly alleged such a claim. Mem. in Supp. at 8-9.

Several courts have recognized the concept of constructive exclusion in the context of a public entity's disability discrimination, but they have not analyzed it robustly. *See, e.g.*, *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89 (2d Cir. 2012); *Q.C. v. Winston-Salem/Forsyth Cnty. Schs. Bd. of Educ.*, No. 1:19CV1152, 2022 WL 1686905 (M.D.N.C. May 26, 2022). In *Krist*, the court affirmed the trial court's finding that Krist was not constructively excluded when the court assessed the frequency and character (outrageous or demeaning) of the conduct, the impact of the conduct on Krist's behavior, and whether the conduct was designed to drive Krist from the restaurant. 688 F.3d at 96-97.

However, courts' assessments of a hostile environment and constructive

---

[8]  Notwithstanding that emotional distress may help to support the award of compensatory damages in a discrimination claim, *see Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 546-47 (4th Cir. 2003); Mem. in Opp'n at 7, Campbell's alleged frustration and anxiety were responses to lawful conduct so they are of no help here.

discharge based on a hostile environment in the *employment* context are instructive. To state a claim for hostile work environment, a plaintiff must plausibly allege that he is disabled and was subject to unwelcome harassment based on his disability that was sufficiently severe or pervasive that it altered a condition or the privilege of his employment. *Manning v. N.C. State Univ.*, 724 F. Supp. 3d 438, 458 (E.D.N.C. 2024) (quoting *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 177 (4th Cir. 2001)).

"The severe or pervasive element has both a subjective and objective component." *Perkins v. Int'l Paper Co.*, 936 F3d 196, 208 (4th Cir. 2019). To determine if a reasonable person would find the harassment sufficiently severe or pervasive, courts analyze "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Manning*, 724 F. Supp. 3d at 459 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)); *see also id.* (reviewing case law on the objective assessment of the severity and pervasiveness of harassment).

"The conduct must be extreme to be actionable." *Id.* (citing *Faragher v. City of Boca Raton*, 54 U.S. 775, 788 (1998); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277-78 (4th Cir. 2015)). "Simple teasing, sporadic rude language,

offhand comments, jokes related to a protected status, [] isolated incidents (unless extremely serious)," and "mere rude or insensitive treatment" are insufficient to state a hostile environment. *Id.* (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68-69 (2006); *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001); *Faragher*, 524 U.S. at 788; *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998); *Baqir v. Prinicipi*, 434 F.3d 733, 746-47 (4th Cir. 2006), *abrogated in part on other grounds*, *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-80 (2009)).

On the other hand, an environment of "constant[] berate[ment] and harass[ment] [of the employee with a disability] and other disabled workers" "in vulgar and profane language" "at least weekly" and the "encourage[ment] of other employees to ostracize the disabled workers," refusal "to give them necessary materials" to do their job, and causing the employee-plaintiff to suffer back pain as a result of the physical work environment is a hostile environment. *Fox*, 247 F. 3d at 179 (affirming the jury verdict in favor of the employee-plaintiff).

Under this standard, Campbell's claims fail. He has not alleged a lack of meaningful access to services, programs or activities, nor a hostile environment resulting in constructive exclusion from the same. Campbell makes sweeping accusations against the defendants, but they are often

Case 1:24-cv-00948-DAB-JGM    Document 24    Filed 05/22/26    Page 11 of 31

legal conclusions without sufficient factual support or the result of unwarranted inferences, unreasonable conclusions, and arguments. *See Just Puppies, Inc.*, 123 F.4th at 660. And what remains are the very type of sporadic incidents and insensitive comments that courts have rejected time and again as a basis for relief.

Specifically, first and foremost, the law specifically permits an entity to ask the very questions employees and students asked Campbell: (1) is the dog required because of a disability and (2) what work or task is the dog trained to perform. *See* 28 C.F.R. § 35-136(f).

As for the first permissible question – is the dog required because of a disability, on January 5, an employee commented on the need to close food facilities if Aspen were not a service dog (implying that Aspen must be required because of a disability); on January 16, an employee asked about the necessity of Aspen; and on February 16, the non-employee security guard asked about Aspen's status as a service dog.

As for the second permissible question – what work or task is the dog trained to perform, on January 5, the employee demanded to know what specific tasks Aspen was trained to perform and, on March 27, the employee asked what type of service dog Aspen was (implying an inquiry

into the service he is trained to provide).

Campbell alleges that these employees and the security guard were rude and insensitive and that students and an employee interrupted Aspen's work when they tried to pet and talk to her. But, as courts have long recognized, anti-discrimination laws do not impose a civility code. *See, e.g.*, *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68. And employees' and students' alleged conduct towards Campbell and Aspen did "not materially affect the actual accommodation" of Aspen accompanying him around campus. *See Davis v. Univ. of N.C. at Greensboro*, No. 1:19CR661, 2020 WL 5803238, at *11 (M.D.N.C. Sept. 29, 2020).

Campbell sufficiently alleged that he subjectively considered the environment hostile, but the facts as pled, even drawing all inferences in his favor therefrom, do not sufficiently allege that a reasonable person faced with this conduct would plausibly find these conditions severe or pervasive enough to cause constructive exclusion.

And, to state a claim for constructive discharge based on a hostile work environment, a plaintiff must allege "something more" than a hostile work environment. *Decoster v. Becerra*, 119 F.4th 332, 339 (4th Cir. 2024). He must sufficiently allege that the circumstances were "'so intolerable that a reasonable person would

resign,'" *id.* at 339-40 (quoting *Equal Emp. Opportunity Comm'n v. Consol Energy, Inc.*, 860 F.3d 131, 144-45 (4th Cir. 2017)), "'and that [he] actually resigned,'" *id.* at 340 *(*quoting *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019)). Courts "assess intolerability 'by the objective standard of whether a reasonable person in the employee's position would have felt compelled to resign . . . that is, whether he would have had no choice but to resign.'" *Id.* (quoting *Evans*, 936 F.3d at 193). "'Difficult or unpleasant working conditions, without more, are not so intolerable as to compel a reasonable person to resign.'" *Id.* (quoting *Evans*, 936 f.3d at 193).

Here, Campbell has not plausibly alleged "something more" than a hostile environment because he has not sufficiently alleged a hostile environment. Even had he done so, he has not plausibly alleged that a reasonable person would have had no choice but to stop eating at the dining facilities on campus, only attend games with his father or girlfriend,

bench himself, or move off campus.[9] *See* Reply Br. at 2, Docket Entry 21 (stating the same and noting that Campbell "offer[ed] no reasoned rebuttal" to its argument that he failed to allege constructive exclusion and citing Mem. in Opp'n at 3-7). Therefore, his constructive exclusion argument fails.

Campbell also argues that the University's response to his reports of discrimination "satisf[y] the 'deliberate indifference' standard."[10] Mem. in Opp'n at 6 (citing *Proctor v. Prince George's Hops. Ctr.*, 32 F. Supp. 2d 820, 829 (D. Md. 1998)). In *Koon*, the Fourth Circuit Court of Appeals recognized that "[t]he deliberate-indifference standard is a common one in the law, though not one [it had] applied to disability discrimination." 50 F.4th at 404. After assessing the standard that other circuits had used in the ADA context, the court held that a plaintiff must show a violation or substantially likely violation of the ADA, knowledge of a substantial risk of the deprivation of those rights, and a failure to act to

---

[9] Although Campbell's cited case, *Rohan*, recognizes and provides the prima facie elements of a hostile environment claim under the ADA, the court did not analyze whether the evidence at summary judgment supported a hostile environment because the plaintiff failed to show she was disabled. *See Rohan*, 375 F.3d at 275-76.

[10] A plaintiff must show the defendant acted with deliberate indifference to receive compensatory damages for a

violation of the ADA or Section 504. *See, e.g.*, *A.J.T. ex rel. A.T. v. Osseo Area Schs.*, 605 U.S. 335, 344-45 (2025) (noting that "courts of appeals generally agree that a plaintiff must show intentional discrimination" to receive compensatory damages and "a majority" of courts of appeals that "have weighed in on the question" find that a plaintiff can show intentional discrimination if "the defendant acted with deliberate indifference") (quotations and citations omitted).

address the risk. *Id.* at 405. "If there wasn't any ADA violation (or any substantially likely ADA violation), there was nothing to be deliberately indifferent about." *Id.*

That is the case here. Campbell has not sufficiently alleged a violation or a substantially likely violation of the ADA or Section 504, for all the reasons described above. His deliberate indifference argument necessarily fails. And even if he had sufficiently alleged disability discrimination, the factual allegations do not support a reasonable inference that the University or Board of Governors failed to act. Instead, Campbell alleges Wise and Vires *did* act, just not in ways he found sufficient.

Campbell's allegations thus stand in marked contrast to other discrimination claims advanced in an academic setting. For example, the Fourth Circuit Court of Appeals' decision in *Constantine* is instructive.[11] There, Constantine, a law student at George Mason University, suffered from "intractable migraine syndrome" which struck during a final exam. 411 F.3d at 478. She alerted the test administrators and requested additional time to finish, but they refused. *Id.* She failed the exam and requested a grade appeal and to take the exam again, but university officials denied those requests. *Id.* She complained to the

professor, the dean, and other law school officials. *Id.*

Three months later, the dean agreed that Constantine could take the final exam again "sometime in June" after she finished her spring courses. *Id.* However, on May 17, she received an email notifying her that she must retake the exam on May 21. *Id.* She notified the dean, the law school registrar, and two other administrators that she would not be able to take the exam at that time because she had a conflict with another class and the dean had told her she could retake it in June. *Id.* at 478-79. Unmoved, the officials told her she had to take the exam on May 21 or forfeit her right to do so. *Id.* at 479. Constantine declined to take the exam that day. *Id.* The university offered to give her another chance to take the exam, but she believed they had decided to give her an F on the exam in retaliation for her complaints. *Id.* She took the exam and received an F, which delayed her graduation and her judicial clerkship. *Id.*

The court found that Constantine sufficiently alleged that the university "excluded her from meaningful participation in [the professor's] course or denied her the benefits of the course, or at least discriminated

---

[11] Although this opinion pre-dates *Iqbal/Twombly*, the allegations meet the pleading requirement those cases

established. *See, e.g.*, *Davis*, 2020 WL 5803238, at \*12 (comparing to the allegations in *Constantine*).

against her with respect to that course." *Id.* at 499.

Likewise, the student in *Alexander v. University of North Carolina at Charlotte*, No. 3:04CV570, 2005 WL 1994520, at *6 (W.D.N.C. Aug. 11, 2005), sufficiently alleged that the college discriminated against him because of his disability.[12] Alexander suffered from cerebral palsy and required assistance to walk to and attend his daily activities. *Id.* at *1. During his freshman year, he lived in an accessible room with a large bathroom. *Id.* Alexander was to attend summer school and the university planned for all students to live an on-campus housing complex that was further from the classroom building than Alexander's freshman year residence; the bathroom was too small for Alexander, the desks were not useable, and there was no curb cut for him to access the sidewalk. *Id.* at *1-2.

When Alexander's mother learned of this plan, she met with university officials about his housing needs, who proposed another unsuitable room. *Id.* at *2. Ultimately, Alexander lived at home during the summer session and relied on his mother for transportation. *Id.* at *3.

The court found that Alexander sufficiently alleged that the university "excluded him from campus housing, or denied him the benefits of such housing, or at least discriminated

against him with regard to the prohibitive summer housing on the basis of his disability" in violation of Section 504. *Id.* at *6.

Finally, in *Alejandro v. Palm Beach State College*, 843 F. Supp. 2d 1263, 1270, 1272 (S.D. Fla. 2011), *reconsideration denied*, (S.D. Fla. 2012), the court found the student-plaintiff sufficiently demonstrated a substantial likelihood of success on the merits and granted her injunction requiring the college to allow her to bring her service dog to all areas of campus.

There, after permitting Alejandro's service dog to accompany her on campus for three semesters, college officials required voluminous documentation describing her need for the service animal, which she provided. *Id.* at 1266. But officials refused to allow her to take the dog to class and when she continued to do so, they escorted her off campus and brought disciplinary hearings against her. *Id.* At the end of her fourth semester, when officials finally agreed to allow the dog to accompany her to class, she had missed so many classes that she had failed one of her courses and she was still questioned about the dog, escorted out of the library, and prohibited from bringing the dog to the writing lab. *Id.*

These allegations stand in contrast to those Campbell advances. His claims more closely track those in *Davis*,

---

[12] Although this opinion pre-dates *Iqbal/Twombly*, the allegations meet the

pleading standard that those cases established.

wherein the court dismissed the student's ADA claim. Davis, who suffered from ADHD, requested and received extended time and quiet locations for taking exams to limit interruptions. 2020 WL 5803238, at *3. However, she alleged that two members of the university's staff "repeatedly interrupted [her] during testing," "frequently mocked [her] disability in front of other students[,] and yelled at [her] prior to exams over her requested accommodations." *Id.* Those same individuals allegedly threatened to have her dismissed from her program if she complained. *Id.*

Davis reported these incidents to OARS at UNCG, and, in response, the university's staff claimed she was not fit for the program, fabricated documents to look like she was not completing her work correctly, falsely accused her of insubordination, and told her they would find a reason to "get rid of" her. *Id.*

The court found that the mocking and threats to dismiss Davis from the program did "not materially affect the actual accommodations of extended time and a quiet testing environment." *Id.* at *11. Even though she alleged that staff repeatedly interrupted her during test-taking, she did not allege when or how often they interrupted her, how severely they affected her quiet environment, or how it affected her performance. *Id.* at *12. "[T]he vague interruptions alleged [were] a far cry from the severity of *Constantine.*" *Id.*

Davis "was not prevented from taking exams, nor was she outright denied extra time or quiet test-taking rooms." *Id.* In sum, she failed to allege that she "was excluded from the [] program or was even prevented from advancing within it . . . because she has ADHD or because certain individuals frustrated the approved accommodations." *Id.* Her allegations suggested nothing "'more than a sheer possibility' that Defendants failed to provide reasonable accommodations." *Id.* (quoting *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556-57)).[13]

Likewise, intermittent and boorish questions from various individuals, University and otherwise, considered

---

[13] Although outside of the education context, the Second Circuit Court of Appeals affirmed the dismissal of a plaintiff's ADA claim involving the use of her service dog in *Krist*. There, Krist was a regular customer at Coopertown Restaurant which was "her primary social community." 688 F.3d at 91. But when she began taking her service dog to the restaurant, employees were "very cool" to her and a restaurant owner stared and growled at the dog from behind the counter. *Id.* at 91-92. When she took the dog out from the under the table to show a customer, a restaurant owner yelled and claimed she was playing with her dog. *Id.* at 92. On another visit, a restaurant owner yelled at her because the dog was beside her chair rather than under the table. *Id.* Krist went to the restaurant less. *Id.* Months later, she stopped going altogether. *Id.*

in the light most favorable to Campbell's claims, did not prevent him from enjoying the benefits of University facilities and activities. And so he has failed to allege a plausible claim of discrimination against UNCG or the Board of Governors under the ADA or Section 504 of the Rehabilitation Act.[14] Therefore, the Court should dismiss Counts I and II.

### B. The Title VI claim fails as a matter of law.

Campbell alleges that UNCG and the Board of Governors discriminated against him on the basis of his race in violation of Title VI of the Civil Rights Act of 1964, as their response (or lack thereof) to his report about the February 16, 2024 baseball game shows. He contends that the University and Board of Governors "den[ied] him equal access to its facilities, programs, and services" and "failed to implement adequate oversight, training, and administrative controls to ensure compliance with federal anti-discrimination laws." Second Am.

Compl. ¶¶ 130, 132. He claims the actions of the University and Board of Governors were "part of a broader pattern of systemic failures" and "reflect a willful disregard of [his] rights under Title VI." *Id.* ¶¶ 131, 136.

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

To state a claim for discrimination in violation of Title VI, a plaintiff must allege that the defendant is a recipient of federal funds and intentionally discriminated against him "on the basis of race, color, or national origin." *Lucas v. VHC Health*, 128 F.4th 213, 221 (4th Cir. 2025) (citation omitted) (applying Title VI to the plaintiff's claim of race discrimination in violation of the Affordable Care Act ("ACA") where Section 1557 of the ACA "forbids excluding someone from health

---

The court described the owners' shouting incidences as isolated and directed towards moving the dog out of the way. *Id.* at 96-97. The employees' behavior was not outrageous or demeaning. *Id.* at 96. The court explained that "the ADA does not impose a civility code." *Id.* (citing *Camarillo v. Carrols Corp.*, 518 F.3d 153, 157 (2d Cir. 2008) (agreeing that "the ADA cannot regulate individuals' conduct so as to ensure that they will never be rude or insensitive to

persons with disabilities") (citation omitted); *Cannice v. Norwest Bank Iowa N.A.*, 189 F.3d 723, 726 (8th Cir. 1999) ("Insensitivity alone does not amount to harassment; the ADA, like Title VII, is not in effect a 'general civility code.'")).

[14] Campbell did not allege, and does not argue in response to the defendants' motion, disability discrimination based on disparate treatment.

programs based on the 'ground prohibited under' Title VI").

To state a claim for racial harassment in violation of Title VI, a plaintiff must allege that the defendant is an educational institution that receives federal funds, he was subjected to harassment based on his race, the harassment was sufficiently severe or pervasive to create a hostile environment in an educational program or activity, and there is a basis for imputing liability to the university. *See Feminist Majority Found. v. Hurley*, 911 F.3d 674, 686 (4th Cir. 2018) (determining the sufficiency of allegations of sexual harassment in violation of Title IX); *Ricketts v. Wake Cnty. Pub. Sch. Sys.*, 125 F.4th 507, 521 (4th Cir. 2025) (noting that "Title VI claims 'are parallel' to Title IX claims and 'operate in the same manner'" and applying the Title IX harassment standard to assess the sufficiency of a Title VI claim for student-on-student racial harassment) (citation omitted).

To hold an institution liable for the conduct of its employees, the plaintiff "must plausibly plead that [the institution] acted with deliberate indifference to the intentional discrimination of its agents." *Lucas*, 128 F.4th at 221-22.

Here, the only allegations of race discrimination involve the security guard at the February 16, 2024 baseball game on campus. Campbell alleges that the "three white individuals with dogs [who] were also

present at the game" were not "subjected to" having the guard follow them throughout the facility and ask about their dogs, erroneously identify the dogs as emotional support dogs, and speak to them in a loud, dismissive, and aggressive tone, "the treatment [he] endured." *Id.* ¶¶ 34-37. In sum, he argues that he was treated differently than similarly situated white attendees. And while those allegations may be consistent with discrimination, they do not support a reasonable inference of discrimination. *See, e.g.*, *McCleary-Evans*, 780 F.3d at 586.

In *McCleary-Evans*, the plaintiff had worked for the state of Maryland for over twenty years when she applied for two open positions in a different state division. *Id.* at 583. She alleged that she was not chosen for either position, "[d]espite her prior work experience and education." *Id.* Instead, the state hired non-Black candidates for those positions. *Id.* McCleary-Evans argued this constituted gender and race discrimination. *Id.* She alleged that her applications were "'subject to a review panel significantly influenced and controlled by . . . a White male in the Office of Environmental Design ('OED') who worked under the supervision of . . . a non-Black woman.'" *Id.* (quoting the complaint). "During the course of her interview, and based upon the history of hires within OED, . . . both [individuals] predetermined to select for both positions a White male or female candidate." *Id.* She also alleged that

18

they "'overlooked the African American candidates to select White male, preferably, and White female candidates'" "'for reasons of race and gender.'" *Id.* at 583-84 (quoting the complaint).

The court affirmed the district court's dismissal of the complaint. "While [McCleary-Evans] did allege that the Highway Administration failed to hire her, she did not allege facts sufficient to claim that the reason it failed to hire her was because of her race or sex." *Id.* at 585. "[S]he repeatedly alleged that the Highway Administration did not select her because of the relevant decisionmakers' bias against African American women," "[b]ut those 'naked' allegations – a 'formulaic recitation' of the necessary elements – 'are no more than conclusions' and therefore do not suffice." *Id.* (quoting *Iqbal*, 556 U.S. at 678-79). The court explained that McCleary-Evans' allegations were "*consistent* with discrimination," but they did not "support a *reasonable inference* that the decisionmakers were motivated by bias." *Id.* at 586 (emphasis in original).

The court explained that the "consequence" of reversing the district court "would be that any qualified member of a protected class who alleges nothing more than that she was denied a position or promotion in favor of someone outside her protected class would be able to survive a Rule 12(b)(6) motion[,]" despite "the Supreme

Court's command that a complaint must allege "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 588 (quoting *Iqbal*, 556 U.S. at 678).

Likewise, the allegations in the Complaint raise only a "sheer possibility" that anyone acted unlawfully at the baseball game. *Compare with McCarter v. Univ. of N.C. at Chapel Hill*, No. 1:20-CV-1050, 2021 WL 4482983, at *11 (Sept. 30, 2021) (finding sufficient allegations of Title VI racial harassment where University personnel "delayed [the plaintiff's] graduation, removed him from a longstanding research project, refused to publish his manuscript, and plagiarized his work," and he was the only student in his section subject to this treatment and indeed, the only African-American, raising the "inference that Plaintiff was singled out for mistreatment by [specified defendants] while members of other races were not[]"). And even assuming *arguendo* that Campbell sufficiently alleged the security guard intentionally discriminated against him based on his race, he has not sufficiently alleged that the University was deliberately indifferent to that conduct.

After the game, Campbell emailed Wise "concerning his inability to access the baseball game free from discrimination and harassment," and Wise suggested he "contact the

security guard's employer to express additional concerns[.]" *Id.* ¶ 39.

Campbell alleges that OARS "is one of the entities on campus responsible for enforcing *accessibility* at campus events, including sporting events." Second Am. Compl. ¶ 38 (noting in footnote 3 that the University's policy requires OARS to review a complaint about *accessibility* at a University event and contact the event organizer) (emphases added).

There is no allegation that Wise had any authority to remedy a complaint about race discrimination or racial harassment. Furthermore, there is no allegation that the University (or Wise) had authority over the security guard who was not a University employee.

In addition, based on Campbell's allegations, he reported to Wise that the security guard followed him, asked about Aspen in an aggressive tone, and was rude, but the security guard did not do the same thing to the three white attendees who also had dogs. The facts do not plausibly allege that Wise knew "of the facts from which a federal-rights violation could be inferred," much less that she made a 'deliberate or conscious choice to ignore'" them. *Koon*, 50 F.4th at 406-07 (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)).

Campbell does not even allege that Wise *ignored* his complaint. Instead, he alleges that she suggested he contact the security guard's employer

to express his concerns. Although he alleges that she should have investigated his complaint "as required by UNCG policy," as noted above, the alleged policy covers accessibility, not race. And his belief that she should have responded differently is not sufficient to allege deliberate indifference. *Koon*, 50 F.4th at 406 ("It is not enough simply to point to what could or should have been done.").

Because Campbell has failed to state a claim for race discrimination or racial harassment in violation of Title VI, the Court should dismiss Count III.

### C. The § 1983 supervisor liability claim fails as a matter of law.

Campbell asserts a claim against Wise and Vires for supervisor liability pursuant to 42 U.S.C. § 1983. He alleges that they "failed to take reasonable and necessary steps to correct, remedy, or prevent the ongoing unlawful disability discrimination." Second Am. Compl. ¶ 93.

Section 1983 prohibits an individual acting under color of state law from depriving a person "of any rights, privileges, or immunities secured by the Constitution and laws."

"In a § 1983 suit . . . the term 'supervisor liability' is a misnomer." *Iqbal*, 556 U.S. at 677. A supervisor can only be liable under § 1983 for "their *personal* wrongdoing or supervisory actions that violated

20

constitutional norms." *Timpson ex rel. Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 257 (4th Cir. 2022) (emphasis added). The supervisor's "'indifference or tacit authorization'" of "a constitutional violation committed by a subordinate state or local government official" must be "'a causative factor' in enabling the violation." *Bolick v. Anderson*, 169 F.4th 528, 541 (4th Cir. 2026) (quoting *Shaw v. Stroud*, 13 F.3d 791, 798-99 (4th Cir. 1994)). To determine if a supervisor is liable, courts "must consider whether the supervisor's own 'deliberate indifference permitted the constitutional abuses to continue unchecked.'" *Id.* (quoting *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984)).

A plaintiff must plausibly allege

(1) that the supervisor had actual or constructive knowledge that [her] subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional [or other legal] injury to citizens like the plaintiff;

(2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference

to or tacit authorization of the alleged offensive practices; and

(3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional [or other legal] injury suffered by the plaintiff.

*Timpson ex rel. Timpson*, 31 F.4th at 257 (quoting *Shaw*, 13 F.3d at 799).[15]

Wise and Vires argue that Campbell did not allege that either of them supervised any of the individuals who discriminated against him, or that the conduct was widespread so as to provide sufficient notice, or that Wise or Vires acted with deliberate indifference, or that they were motivated by discriminatory intent. Mem. in Supp. at 14-16. They also argue that neither the ADA nor Section 504 can be the basis for the § 1983 claim. *Id.* at 14-15.

Campbell contends that his allegations support Wise's and Vires' "tacit authorization of the discriminatory practices" and they had authority to act. Mem. in Opp'n at 9. Campbell also argues that the ADA and Section 504 can be the bases for his § 1983 claim because the "Fourth Circuit has not categorically barred such claims" and his "§ 1983 claim

---

[15] While the *Shaw* court was considering a summary judgment motion, district courts in this circuit cite these elements when discussing pleading requirements. *See, e.g.*, *Keeton v. Dudley*, 753 F. Supp.

3d 444, 450 (E.D. Va. 2024); *Armstrong v. City of Greensboro*, 190 F. Supp. 3d 450, 466 (M.D.N.C. 2016); *Hill v. Robeson County*, 733 F. Supp. 2d 676, 688 (E.D.N.C. 2010).

also rests on equal protection violations." *Id.*

Campbell bases his claim against Wise and Vires on violations of the ADA and Section 504 (and by conclusory reference to the Fourteenth Amendment). *See* Second Am. Compl. ¶¶ 91, 93, 95, 98, 99. But because the court recommends dismissal of the ADA and Section 504 claims, they cannot support the claim. *See G.M. v. Va. Beach Sch. Bd.*, No. 2:24-cv-59, 2025 WL 1819269, at *7 (E.D. Va. Feb. 6, 2025) (referring to its earlier dismissal of the § 504 claim supporting the § 1983 claim).

Even had those claims survived, though, "multiple district courts in the Fourth Circuit, as well as numerous courts of appeals, have held that § 1983 cannot vindicate rights under the ADA given the ADA's comprehensive remedial scheme." *Id.* (citing *Anderson v. Sch. Bd. of Gloucester Cnty.*, No. 3:18-cv-745, 2020 WL 2832475, at *21-22 (E.D. Va. May 29, 2020) (collecting cases)). *See also Gatling v. Carter*, No. PX 15-3723, 2017 WL 480756, at *6 (D. Md. Feb. 6, 2017) (addressing a Rehabilitation Act-based § 1983 claim and collecting cases).

Furthermore, even though Campbell's complaints did not evince widespread discrimination despite his conclusory allegations to the contrary, neither Wise nor Vires were deliberately indifferent to or tacitly authorized disability discrimination against Campbell, as alleged. Specifically, Wise responded to each of Campbell's reports. She "acknowledged the seriousness of" and "agreed to investigate" the January 5 incident. Second Am. Compl. ¶ 22. She "responded [to the complaint about the January 16 incident] that Defendant UNCG would work on training school staff and students on service animal policies, procedures, and best practices." *Id.* ¶ 28. "Wise advised that Defendant UNCG was working on retraining staff in the food areas and that flyers had been posted around campus to educate students" after Campbell's report about the January 25 episode. *Id.* ¶ 32. She also "asked [Campbell] to speak with . . . a Manager in dining services[] about his experiences." *Id.* ¶ 33. In response to Campbell's report about the February 16 incident, Wise suggested that Campbell contact the security guard's employers to express his concerns. *Id.* ¶ 39.

After having reported the March 27 incident to Meadows, Campbell emailed Wise and Vires to tell them "his belief that the processes Defendant UNCG was purportedly utilizing to address the ongoing discrimination were insufficient." *Id.* ¶ 45. Vires responded that "OARS was working to train university employees on the two questions they were permitted to ask under the ADA and to dispel the misconception that all service animals are 'seeing eye dogs.'" *Id.* ¶ 47. She also "indicated that she was working to have flyers placed around campus to increase awareness." *Id.* ¶ 48.

Case 1:24-cv-00948-DAB-JGM     Document 24     Filed 05/22/26     Page 22 of 31

None of these allegations plausibly claim that Wise or Vires made a conscious decision to ignore Campbell's complaints. And Campbell did not even allege that Wise or Vires supervised any of the alleged wrongdoers. Campbell's belief that their responsive efforts were insufficient does not sufficiently allege deliberate indifference. *See Koon*, 50 F.4th at 406.

Campbell states in response to Wise's and Vires' challenge to this claim that his "§ 1983 claim also rests on equal protection violations." Mem. in Opp'n at 9. To state an equal protection claim without direct evidence of discrimination, a plaintiff must allege "'that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Lee v. Boyd*, 799 F. Supp. 3d 507, 511-12 (W.D. Va. 2025) (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)).

Even assuming that Campbell sufficiently alleged these elements, he has not plausibly alleged that Wise and Vires tacitly authorized or were deliberately indifferent towards his complaint about race discrimination. As set forth earlier, *see supra* at 23, there are no allegations that Wise and Vires had any role whatsoever related to addressing reports of race discrimination, had any authority over the security guard, tacitly authorized the race discrimination, or acted with deliberate indifference

towards Campbell's report of race discrimination.

Campbell has thus failed to state a § 1983 claim against Wise and against Vires. The Court should dismiss Count IV.

### D. Qualified immunity would apply.

Wise and Vires argue that, even had Campbell sufficiently alleged a § 1983 claim against them, qualified immunity would protect them from suit. Mem. in Supp. at 17-18 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 741 (2011)). Citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), and 28 C.F.R. § 35.136(f), Campbell disagrees. Mem. in Opp'n at 10-11.

"Qualified immunity shields . . . state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft*, 563 U.S. at 735.

The second prong requires that, "at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* at 741 (cleaned up). There need not be a case directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *see also Hope*, 536 U.S. at 741 (noting that neither cases

with "fundamentally similar" facts nor "materially similar" facts are required; the question "is whether the state of the law [at the time of the conduct] gave [officials] fair warning that their alleged treatment of [the plaintiff] was unconstitutional").

Here, Wise and Vires frame "the relevant legal question" as follows: "Was it clearly established, under the circumstances faced by Vires and Wise, that endeavoring to educate and inform University staff and students about service animal policies and best practices, and attempting to connect Plaintiff with dining services and security providers was in violation of some federal law?" Mem. in Supp. at 17-18.

Campbell does not dispute this description of the issue, although he more generally describes "repeated interference with a service animal and failure to investigate formal complaints" as precluding immunity because "[n]o reasonable official could believe" those actions "met the requirements of the ADA and Section 504." *See* Mem. in Opp'n at 10-11.[16]

As already addressed, Campbell has not sufficiently pled that Wise or Vires violated his statutory or constitutional rights. Had he plausibly alleged a § 1983 claim, he has not sufficiently pled that, at the time of the alleged conduct, every reasonable official would believe that

responding as Wise and Vires did violated the law.

In sum, even had Campbell plausibly alleged a § 1983 claim against Wise or Vires, each would be entitled to qualified immunity.

### E. The IIED claim fails as a matter of law.

Campbell alleges that Wise's and Vires' "failure to take affirmative action" to address his "numerous complaints" of discrimination "was extreme and outrageous, particularly given their positions of authority and their duty to ensure compliance with federal and state disability laws." Second Am. Compl. ¶ 139. Despite receiving his "increasingly anxious written communication[s] . . . asking for help [and] detail[ing] the emotional distress and harm" he suffered, neither Wise nor Vires timely or meaningfully acted. *Id.* ¶¶ 140-41. Instead, they "acted with reckless disregard" and "demonstrated callous indifference" to Campbell's rights and emotional harm. *Id.* ¶ 142; *see also id.* ¶¶ 143-51 (alleging the injuries he suffered as a result of the inaction of Wise and Vires).

To state a claim for intentional infliction of emotional distress in North Carolina, a plaintiff must allege, "'1) extreme and outrageous conduct by the defendant 2) which is intended to and does in fact cause 3)

---

[16] Campbell initially stated in his response that his "right to be free from discrimination under the ADA, Section 504, and the Equal Protection Clause

were clearly established." Mem. in Opp'n at 9. But he rests his argument on the ADA and Section 504.

Case 1:24-cv-00948-DAB-JGM    Document 24    Filed 05/22/26    Page 24 of 31

severe emotional distress.'" *Sheaffer v. Cnty. of Chatham*, 337 F. Supp. 2d 709, 732 (M.D.N.C. 2004) (quoting *Waddle v. Sparks*, 414 S.E.2d 22, 27 (N.C. 1992)); *see also Payne v. Nat'l Jewelry & Pawn, Inc.*, No. 1:25CV24, 2026 WL 705064, at *1 (M.D.N.C. Feb. 18, 2026), *adopted*, 2026 WL 701391 (M.D.N.C. Mar. 12, 2026) (stating the same). "Conduct is extreme and outrageous only when it is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Sheaffer*, 337 F. Supp. 2d at 732 (quoting *Hogan v. Forsyth Country Club Co.*, 340 S.E.2d 116, 123 (N.C. Ct. App. 1986)); *see also Payne*, 2026 WL 705064, at *1 (stating the same). The assessment of whether conduct is extreme and outrageous is a question of law. *Foster v. Crandell*, 638 S.E.2d 526, 537 (N.C. Ct. App. 2007).

And "North Carolina courts have set a high bar with respect to what constitutes outrageous conduct." *Doe v. Lees-McRae College*, No. 1:20CV105 MR WCM, 2021 WL 1096285, at *8 (W.D.N.C. Feb. 4, 2021), *adopted*, 2021 WL 1093635 (Mar. 22, 2021). For example, requiring a pregnant employee to carry heavy loads and refusing to allow her leave to go to the hospital is not extreme and outrageous conduct for purposes of this claim. *Hogan*, 340 S.E.2d at 122-23. Neither are "poor performance evaluations," failure to promote, exclusion from training, and termination. *Pardasani*

*v. Rack Room Shoes*, 912 F. Supp. 187, 192 (M.D.N.C. 1996). And "mere insults, indignities, and threats" fall short. *Guthrie v. Conroy*, 567 S.E.2d 403, 409 (N.C. Ct. App. 2002).

By way of contrast, though, the following acts do constitute extreme and outrageous conduct:

- The commission of murder, *Eubanks v. State Farm Fire & Cas. Co.*, 485 S.E.2d 870, 872 (N.C. Ct. App.), *disc. review denied*, 493 S.E.2d 452 (N.C. 1997);
- Years' long "unending barrage of abuse, harassment, threats, scorn, and derision . . . that at times spilled over into physical confrontation and attack," *Radcliff v. Avenel Homeowners Ass'n, Inc.*, 789 S.E.2d 893, 907-08 (N.C. Ct. App. 2016), *disc. review denied*, 799 S.E.2d 42 (N.C. 2017);
- "[W]rongfully and publicly suggest[ing] that [the student plaintiff] was to blame for being raped" and then "purposefully 'dup[ing]' her into withdrawing from school and treat[ing] a request for temporary leave as a mechanism to permanently rid [the school] of a student complaining about the University's response to her rape," *Rouse v. Duke Univ.*,

25

869 F. Supp. 2d 674, 681-82 (M.D.N.C. 2012).

In the educational context, the court in *Mandsager v. University of North Carolina at Greensboro*, 269 F. Supp. 2d 662, 683 (M.D.N.C. 2003), found that the plaintiff sufficiently alleged the individual defendants intentionally inflicted emotional harm on her.[17]

There, the plaintiff's direct supervisor in her Ph.D program, Dr. Purkey, sexually harassed her and directly propositioned her. *Id.* at 669-70. Mandsager notified her department chair, who first shrugged off the behavior and then "'reminded [her] that Purkey was responsible for her grade in that class.'" *Id.* at 670. At a planned remedial discussion, the chair directed Mandsager to sit at the table, entered the room with Dr. Purkey and remained standing, and permitted Dr. Purkey to read a prepared statement and leave the room. *Id.* After the plaintiff complained in writing, she was subject to a host of adverse actions. The University removed her from her teaching assistant position "for obvious reasons," stripped her of her clinical supervisor role, prevented her from completing her research under the terms that accommodated her learning disability, directed her to redo work already completed, and advised her to seek outside employment the next semester. *Id.* at

670-71. In addition, three of four professors resigned from her doctoral committee. *Id.* at 671.

These allegations supported "an inference that the defendants' response to her complaints about Dr. Purkey's conduct was extreme and outrageous." *Id.* at 683. She had also sufficiently alleged she suffered severe emotional distress. *Id.*

In *McClean v. Duke University*, 376 F. Supp. 3d 585, 613 (M.D.N.C. 2019), the court found the student's allegations sufficient. McClean, a student at the university's medical and graduate schools, reported her rape, but the rapist was in a relationship with the school's Coordinator of Gender Violence Intervention Services. The culprit continued harassing McClean, threatening that his girlfriend would undermine her credibility and destroy her reputation. *Id.* Indeed, he and his girlfriend made false stalking reports to the university's police department, disclosed McClean's "confidential sexual assault report widely within the university," caused a university police officer "to make a false statement about her" at a hearing on the rapist's detention, and "compil[ed] and disseminat[ed] negative information about [her] to destroy her reputation" at the university and within the medical community. *Id.* at 595-96. The court described McClean's allegations

---

[17] Although this case pre-dates *Iqbal/Twombly*, its allegations meet that pleading requirement.

against the rapist as "wholly within the realm of 'extreme and outrageous conduct.'" *Id.* at 613.

Wise and Vires argue that Campbell failed to allege their conduct was extreme and outrageous. Mem. in Supp. at 19 (citing *Pardasani*, 912 F. Supp. at 192; *Groves v. Travelers Ins. Co.*, 552 S.E.2d 141 (N.C. 2001); *Ausley v. Bishop*, 515 S.E.2d 72, 80 (N.C. Ct. App. 1999), *rev'd on other grounds*, 572 S.E.2d 153 (N.C. 2002)).

Here, Campbell generally "alleges sustained mistreatment that exacerbated his known mental health disability." Mem. in Opp'n at 10 (citing *Waddle v. Sparks*, 414 S.E.2d 22 (N.C. 1992)). He does not address the argument that his "sustained mistreatment" is not extreme and outrageous. Although the Court could consider Wise's and Vires' argument on this point uncontested, s*ee* M.D.N.C. Civ. L.R. 7.3(k) (providing that the court will consider and decide a motion as uncontested when "no response brief is filed"), review on the merits confirms it. Because Campbell has failed to allege that Wise or Vires intentionally inflicted emotional distress, the Court should dismiss Count Five.

    F. The NIED claim fails as a matter of law.

As an alternative to his intentional infliction of emotional distress claim, Campbell alleges that Wise and Vires negligently inflicted emotional distress on him. He claims they owed him a duty of care but breached that duty when they failed to act or failed "to act appropriately." Second Am. Compl. ¶¶ 155-56. Their inaction or improper action "was particularly egregious" because they knew of Campbell's PTSD and need for Aspen to mitigate his symptoms. *Id.* ¶ 157. "As a direct and foreseeable result of [their] negligence, [his] PTSD was exacerbated," and he suffered "heightened anxiety, difficulty concentrating, physical symptoms of stress, . . . [and] severe emotional distress, requiring continued mental health treatment and significantly altering his daily life and academic experience." *Id.* ¶¶ 158, 161.

To state a claim for negligent infliction of emotional distress, "a plaintiff must allege that (1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress . . ., and (3) the conduct did in fact cause the plaintiff severe emotional distress." *Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A.*, 395 S.E.2d 85, 97 (N.C. 1990). "Although an allegation of ordinary negligence will suffice, a plaintiff must also allege that severe emotional distress was the foreseeable and proximate result of such negligence in order to state a claim; mere temporary fright, disappointment or regret will not suffice." *See id.* "In cases involving omissions, negligence may arise where a 'special relationship' exists between the parties." *Davidson v.*

27

*Univ. of N.C. at Chapel Hill*, 543 S.E.2d 920, 926 (N.C. Ct. App. 2001), *disc. review denied*, 550 S.E.2d 771 (N.C. 2001).[18]

Wise and Vires advance two arguments undercutting the first element of this claim. One: Campbell failed to allege a legal duty. Mem. in Supp. at 21. Two: Campbell bases this claim on the same conduct he alleged supported his ADA, Section 504, and Title VI claims – all of which are claims of "'inherently intentional'" discriminatory conduct. *Id.* at 22 And, at least as this court found in *Thomas v. N. Telecom, Inc.*, 157 F. Supp. 2d 627, 637 (M.D.N.C. 2000), intentional conduct cannot be the basis of the negligent infliction of emotional distress claim. *Id.*

Campbell provides a cursory defense, arguing that "[t]he University-student relationship, paired with actual knowledge of [his] condition, creates a duty under" *Johnson*. Mem. in Opp'n at 10. But *Johnson* does not support this conclusion. He does not

address any case law on whether the University owed him a legal duty because of his status as a student. And while courts have found that some circumstances do create a legal duty on the part of a college toward a student, those circumstances are limited.

The North Carolina Court of Appeals found that a university owed a student cheerleader who was injured during practice a legal duty because of their mutual dependence. *Davidson*, 543 S.E.2d at 927. The university "depended upon the cheerleading program for a variety of benefits," and "the cheerleaders received significant benefits from [the university] as a result of participating in the cheerleading program." *Id.* The court "also [found] it significant that [the university] exerted a considerable degree of control over its cheerleaders." *Id.*

Particularly relevant here, the court warned that this was a factually specific finding, and "should not be

---

[18] Wise and Vires argue that Campbell is required to bring this claim in the North Carolina Industrial Commission, pursuant to N.C. Gen. Stat. § 143-291(e). Mem. in Supp. at 20-21. Not only do they fail to cite any case law supporting their position, but this court recently addressed a similar argument and recognized that "[m]ost courts have concluded, to the contrary, that the statute does not preclude individual capacity negligence claims in federal court." *Forero v. Univ. of N.C. at Chapel Hill*, No. 1:24cv930, 2026 WL 891991, at *1 (M.D.N.C. Mar. 31, 2026) (citing *Neal*

*v. Carter*, No. 5:24-CT-3138-FL, 2026 WL 820852, at *5 & n.4 (E.D.N.C. Mar. 25, 2026) (citing *Carias v. N.C. Dep't of Pub. Safety*, No. 1:24-CV-765 (RDA/JLW), 2025 WL 2404530, at *8 (M.D.N.C. Aug. 19, 2025) (collecting cases))). Further, N.C. Gen. Stat. § 143-291(e) is inapplicable here because Campbell sues Wise and Vires in their individual capacities. Campbell mistakenly includes this argument as part of his opposition to Wise's and Vires' arguments about his *intentional* infliction of emotional distress claim. Mem. in Opp'n at 10.

interpreted as finding a special relationship to exist between a university, college, or other secondary educational institution, and every student attending the school, or even every member of a student group, club, intramural team, or organization. . . . [T]he student-university relationship, standing alone, does not constitute a special relationship giving rise to a duty of care." *Id.* at 928; *see also McFadyen v. Duke Univ.*, 786 F. Supp. 2d 887, 996 (M.D.N.C. 2011), *rev'd in part on other grounds,* 703 F.3d 636 (4th Cir. 2012) (citing *Davidson* and finding that the university had no "special relationship" with the lacrosse team members "based on their status as students"); *Cash v. Lees-McRae College, Inc.*, No. 1:18CV52, 2018 WL 7297876, at \*13 (W.D.N.C. Aug. 13, 2018), *adopted*, 2019 WL 276842 (Jan. 22, 2019), *aff'd*, 811 F. App'x 190 (4th Cir. 2020) (citing *Davidson* and finding that the college "had no special duty of care with respect to" the student).

Campbell has not alleged any type of mutual dependence between a university and a student, a linchpin of the holdings identified above. Therefore, his status as a student does not impose a legal duty on Wise or Vires. And, to the extent that Campbell argues his status as a student with a disability creates a special relationship according to which the University owed him a legal duty, he has not cited any case law supporting this position.

"It is not clear . . . that either the Rehabilitation Act or the ADA create an independent duty of care for purposes of a negligence claim." *Doe*, 2021 WL 1096285, at \*7 (citing *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 352-53 (11th Cir. 2012); *Strojnik v. Bakersfield Convention Hotel I, LLC*, 436 F. Supp. 3d 1332, 1344 (E.D. Ca. 2020). To that end, although a violation of a safety statute may be negligence per se under North Carolina law, "it is unlikely that the North Carolina courts would find that the ADA is a safety statute or that violation of the ADA constitutes negligence per se[.]" *James v. Peter Pan Transit Mgmt., Inc.*, No. 97-747, 1999 WL 735173, at \*9 (E.D.N.C. Jan. 20, 1999). *See also Cash*, 2018 WL 7297876, at \*14 ("To the extent that Plaintiff Cash alleges that Title IX supplies a duty actionable in negligence, she cannot plead such a claim.")). *Cf. Brockman v. T&B Concepts of Carrboro, LLC*, No. 1:19CV622, 2020 WL 5821169, at \*26 (M.D.N.C. Sept. 30, 2020) (finding "that Plaintiff's Title VII and ADA claims cannot serve as the underlying torts for Plaintiff's negligent hiring, supervision, or retention claims").

In *Doe*, the student alleged that the defendants owed him a duty to keep "him safe from harassment, and to accommodate, recognize, respect, and care for his ADHD condition and anxiety related needs," and that another defendant owed him "a duty to implement policy and procedure creating accommodations for students suffering from disabilities similar to [his], and to take action

29

when failures therein were discovered." 2021 WL 1096285, at *6. Relying on the persuasive authority above, the court dismissed his negligence claim. *Id.* at *7.[19]

This persuasive authority supports a conclusion here that neither the ADA nor Section 504 supplies a basis for Campbell's negligence claim. Therefore, his status as a student with a disability does not impose a legal duty on Wise or Vires.

Because Campbell fails to state a claim for negligent infliction of emotional distress, the Court should dismiss Count Six.

G. Punitive damages cannot be awarded against the University for violations of the ADA, Section 504, or Title VI.

Campbell seeks punitive damages against the defendants. *See* Second Am. Compl. Prayer for Relief ¶¶ 3, 4. However, the Supreme Court has long recognized that punitive damages are not available in private suits alleging violations of the ADA, Section 504, or Title VI. Mem. in Supp. at 22-23 (citing *Barnes v. Gorman*, 536 U.S. 181, 189 (2002) ("Because punitive

damages may not be awarded in private suits brought under Title VI of the 1964 Civil Rights Act, it follows that they may not be awarded in suits brought under § 202 of the ADA and § 504 of the Rehabilitation Act.")[20]

Therefore, even had Campbell sufficiently alleged the University violated the ADA, Section 504, or Title VI, he still could not recover punitive damages.

IV. CONCLUSION

This Complaint is Campbell's third iteration, and he has failed to state a claim against any of the defendants. And, in this Circuit, "district courts are not required to give plaintiffs one without-prejudice ruling on the merits before dismissing with prejudice." *See United States ex rel. Nicholson v. MedCom Carolinas, Inc.*, 42 F.4th 185, 196 (4th Cir. 2022). Because "[d]istrict courts have inherent power to manage their dockets with an eye toward speedy and efficient resolutions" such as dismissing "plainly insufficient" "causes of action with prejudice[,]"

---

[19] Wise and Vires argue that "[i]ntentional conduct cannot form the basis for a negligence claim." *McClean*, 376 F. Supp. 3d at 617 (dismissing the negligence claims against the individual defendants who allegedly intentionally inflicted emotional distress on the plaintiff). Because Campbell did not sufficiently allege intentional conduct in the first place, though, this argument is moot.

[20] As the University recognized, *see* Reply at 13, Campbell failed to respond at all to the argument that he cannot recover punitive damages from the University. Although the court can consider the University's argument uncontested, *see* M.D.N.C. L.R. 7.3(k), the University's challenge is legally correct.

*id.*, this Court recommends the same here.

It is therefore **RECOMMENDED** that the Court grant the defendants' motion to dismiss and dismiss this action with prejudice.

_____

JoAnna Gibson McFadden
United States Magistrate Judge

May 22, 2026
Durham, North Carolina

31